### In re MEMPHIS–FRIDAY'S ASSOCIATES, a Tennessee General Partnership, Debtor.

**Bankruptcy No. 88–23082–B(jn).**

United States Bankruptcy Court,
W.D. Tennessee, W.D.

July 13, 1988.

William M. Gotten, Memphis, Tenn., for debtor.

Ellen Vergos, Paul Amos, Waring, Cox, Memphis, Tenn., for Overton Square Partners.

Thomas M. Minor, Edwin Dean White, III, Farris, Hancock, Gilman, Branan & Hellen, Memphis, Tenn., for Vernbrook Const. Co.

John D. Horne, David F. Leake, Memphis, Tenn., for Memphis–Friday's Associates.

Toni Campbell Parker, Memphis, Tenn., for Connecticut Mut. Life Ins. Co.

## MEMORANDUM OPINION AND ORDER ON MOTIONS FOR RELIEF FROM STAY, FOR ADEQUATE PROTECTION AND FOR ASSUMPTION OF LEASE

WILLIAM H. BROWN, Bankruptcy Judge.

### CASE HISTORY

These proceedings are before the court on related motions of the Debtor, Memphis–Friday's Associates, to assume a commercial lease on property which houses its restaurant establishment known as T.G.I. Friday's; of the lessor, Overton Square Partners (hereinafter "OSP") to obtain relief from the automatic stay in order to obtain ultimate possession of the same property; of the lessor for adequate protection and for sequestration of rents; of the Debtor's franchisor, T.G.I. Friday's, Inc. (hereinafter "Friday's, Inc.") for relief from the automatic stay in order to terminate its franchise agreement with the Debtor and to seek legal remedies for damages; and of Vernbrook, Inc. (hereinafter "Vernbrook") for relief from the stay in order to proceed with a state court lien suit.

Primarily at issue is whether the lease in question was effectively terminated, under applicable nonbankruptcy law, prior to the entry of the order for relief in this case and, if not, whether the Debtor has demonstrated the capability to assume the lease by a showing of adequate assurance of future performance and ability to cure past defaults and to pay damages in accordance with the Bankruptcy Code.[1] The determination of those matters will affect the other reliefs sought by all parties.

The issues presented here were consolidated for hearing on June 27 and June 28, 1988, and constitute core proceedings pursuant to 28 U.S.C. Section 157(b)(2)(A), (G), (M) and (O). The following findings of fact and conclusions of law are made in accordance with Bankruptcy Rule 7052. The parties agreed that the testimony and exhibits from an earlier May 19, and the June 27–28, 1988, hearings would be considered by the court.

The record, as a whole, reflects that the Chapter 11 case of Memphis–Friday's Associates (Debtor), ostensibly a limited partnership, was initiated by a filing of a voluntary petition on April 30, 1988. The petition was signed by an officer of Maruki Tennessee "F," Inc., the general partner of the Debtor. Maruki Tennessee "F," Inc. is owned by Maruki U.S.A. Co., Inc. It was subsequently brought to the court's attention in a May 19, 1988, hearing that the Debtor was not a limited partnership on whose behalf the managing partner could file a voluntary petition but was in fact a general partnership, requiring the consent of all partners for the filing of a voluntary petition. *See* 11 U.S.C. Section 303(b)(3), (d), and Bankruptcy Rule 1004(b) and 1011(a). The court entered a Memorandum Opinion and a separate order on June 7, 1988,[2] and as a result, the voluntary petition was amended to an involuntary one, and the order for relief was vacated pending service on the other general partner of the Debtor, Kenmare Associates (hereinafter "Kenmare"). *See* Bankruptcy Rule 1004(b) and 1011(a) and (b). No answer or objection to the petition was timely filed by Kenmare pursuant to Bankruptcy Rule 1011(b); thus, a default occurred and the court orally directed an order for relief on June 27, 1988, and entered the order on July 13, 1988. As such, in accordance with 11 U.S.C. Section 303(h), the order for relief was effective on the date of entry, not on April 30, 1988. *See* 11 U.S.C. Section 102(6); 2 King *Collier on Bankruptcy* (15th Ed.) par. 102.07.

1. 11 U.S.C. Section 365(b)(1)

2. See 88 B.R. 821 (Bankr.W.D.Tenn.1988).

## PRE–BANKRUPTCY
## FACTUAL HISTORY

The record further reflects that prior to the filing of the original petition on April 30, 1988, the Debtor had received written notice (dated and mailed April 18, 1988) from its landlord, OSP, that due to the Debtor's noncompliance with the terms of the written lease agreement, the lease would terminate on April 30, 1988. (Tr. Ex. 3, 5/19/88). Moreover, the Debtor had also received written notice that due to violations of its franchise agreement with Friday's, Inc., the franchisor would be "compelled to exercise [its] rights under the agreement" if violations were not cured within thirty days of the notice dated April 5, 1988. (Tr. Ex. 22, 6/28/88). The viability of the franchise agreement is dependent on the Debtor's continued operation of its restaurant at its present location, 2115 Madison Avenue, Memphis, Tennessee. (Tr. Ex. 12, 6/27/88). Thus, of foremost importance here is the question of whether the lease has been effectively terminated and is not assumable as a matter of law.

The lease itself grants the Debtor a leasehold interest for a term of fifteen (15) years in nonresidential real estate. It requires that the Debtor, *inter alia*, make fixed monthly rental payments of $15,502.59 due the first day of each month and percentage rental payments based on gross sales, due annually or quarterly (Art. 3 of lease; Tr. Ex. 1, 5/19/88. Further references in this paragraph are to the lease); obtain the landlord's consent for any repairs or alterations to the building which would cost more than $5,000.00 (Par. 7.2(d)); provide the landlord with performance and labor and material payment bonds or a financial statement disclosing a net worth of ten times the cost of any repair work or alterations prior to the commencement of such work if estimated to cost more than $5,000.00 (Par. 7.2(d)); pay promptly when due the entire cost of any work to the premises (Par. 7.1(f)); and forthwith cause to be discharged of record any lien placed against the premises (Par. 7.1(m)). The lease further provides that in the case of default by the Debtor as to any of the above provisions, the landlord may, after providing an opportunity to cure, "serve upon Tenant a notice that this Lease and the Term will terminate on a date to be specified therein." (Par. 9.2(a)). The cure period for a rent default is five (5) days and ten (10) days for other monetary and non-monetary defaults. (Par. 9.2(a)(i)).

The undisputed evidence in the instant proceeding establishes that the Debtor closed its operation and commenced renovations at the restaurant on January 18, 1988. The renovations were undertaken pursuant to a provision in the Debtor's modified franchise agreement with Friday's, Inc. that it would take steps necessary to conform its restaurant operation to the standards required by the franchisor. (Tr. Ex. 12, 6/27/88) At closing, the estimated time for completion of the renovations was two months, while the estimated cost was $250,000.00. The Debtor failed to satisfy the lease requirements that it obtain permission for renovations from the landlord, provide the landlord with specifications for the work to be done, and submit to the landlord performance and labor and material payment bonds or financial statements exhibiting a sufficient net worth of the Debtor, (Par. 7.1 and 7.2 of lease, Tr. Ex. 1, 5/19/88) and on March 1, 1988, the landlord sent notice of such failure, via certified mail, to Mr. Les Victor, an officer of the Debtor and of related entities. (Tr. Ex. 7, 5/19/88) Additionally, on March 1, 1988, the Debtor failed to make its rental payment for that month. Notice of this noncompliance, with instructions to cure same, was sent and received, via certified mail, on March 16, 1988. (Tr. Ex. 2, 5/19/88; Tr. Ex. 32, 6/28/88).

On March 17, 1988, the Tennessee Department of Employment Security filed a lien against the Debtor's property at the premises for non-payment of taxes due. (Tr. Ex. 15, 5/19/88). On March 31, 1988, Vernbrook, the contractor performing the renovations at the restaurant, filed a materialmen's lien against the premises for non-payment of $117,164.47 in remodeling costs. (Tr. Ex. 11, 5/19/88). These liens are alleged to be in further contravention of the lease.

On April 1, 1988, the Debtor again failed to pay its monthly rental and on April 18, 1988, the landlord sent the Debtor the "Notice of Termination and Notice of Additional Defaults" via certified mail. The notice specifies the above defaults and provides that in light thereof, the "Lease and Term thereof will terminate on April 30, 1988." (Tr. Ex. 3, 5/19/88).

Mr. Victor, an officer of the Debtor, Maruki Tennessee "F," Inc. and of Maruki U.S.A. Co. Inc. testified that he attempted several times to cure the defaults by proposing settlement offers but that the landlord "would not let him pay." However, three witnesses for OSP, the landlord, testified that Mr. Victor's only attempt to propose a settlement was made telephonically on April 29, 1988, the day before the indicated termination. More will be said of this "offer" and its admission into evidence at a later point in this opinion.

Thus, with this history, the court comes to the question of whether the lease was effectively terminated by nonbankruptcy law on April 30, 1988, or whether it may be assumed by the Debtor pursuant to bankruptcy law.

### CONCLUSIONS OF LAW WITH FINDINGS OF FACT:

#### LEASE ASSUMPTION

It is well settled that Section 365 of the Bankruptcy Code authorizes the trustee or debtor-in-possession[3] to assume or reject an executory contract or unexpired lease of the Debtor. *See, e.g.,* 2 King, *Collier on Bankruptcy* (15th Ed.), Par. 365.03. This is so, notwithstanding prior defaults by a debtor, if it can be shown that the defaults will be promptly cured and that compensation for actual pecuniary loss resulting from default will be made and that future performance will be in accordance with the contract's terms. 11 U.S.C. Section 365(b)(1). Section 365 is designed to foster the Congressional goal of rehabilitation of financially distressed debtors. It is illustrative of Congress' recognition that the debtor in need of bankruptcy reorganiza-

tion often has landlord problems and that it is not unusual for such a debtor to be behind in rental payments when its bankruptcy petition is filed. *In re Burk Hall Co.,* Bk. No. 87–29184–L, *Memorandum Opinion and Order Re: Lessor's Motion to Obtain Relief From the Stay ... and Debtor's Motion to Assume Certain Unexpired Leases,* unpub. opinion of Chief Judge David S. Kennedy (Bankr.W.D.Tenn. June 22, 1987); *see also, Fontainebleau Hotel Corp.,* 515 F.2d 913, 915 (5th Cir. 1975).

However, even though its policy is to promote rehabilitation of financially distressed debtors, the Bankruptcy Code, including Section 365, is not without protection for lessors and other creditors. This is particularly true for the lessors of nonresidential real estate as evidenced by, for example, the language of Section 362(b)(10) which renders the automatic stay inapplicable to actions by a nonresidential real estate lessor to the debtor to obtain possession of property where the lease has terminated by the expiration of the stated term prior to commencement of or during the bankruptcy case; Section 541(b)(2) which excludes from property of the debtor's estate any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term before the commencement of the case or terminates during the case; and Section 365(c)(3) which prohibits the assumption by the debtor of an *unexpired* lease of nonresidential real property that has been *terminated* "under applicable nonbankruptcy law *prior to the order for relief.*" (Emphasis added.) In addition, where the lease is of nonresidential real estate located in a shopping center, the debtor must establish the source of future rents, that any percentage rent due under the lease will not decline substantially, that the assumption is subject to all of the provisions in its lease and any master lease of the shopping center, and that the assumption will not disrupt any tenant balance in the shopping center, in order to make a showing of adequate assurance of future

---

**3.** *See* 11 U.S.C. Section 1107(a)

performance. 11 U.S.C. Section 365(b)(3). There is evidence that the subject lease is to a portion of a "shopping center." (Tr. Ex. 1, 5/19/88).

Clearly, these Code sections evidence Congress' intent that lessors of nonresidential real property are entitled to significant safeguards. *See also,* 11 U.S.C. Section 365(d)(3) and (4); 130 *Cong.Rec.* S. 8894–05 (daily ed. June 29, 1984) (statements of Sen. Hatch); Bordewieck, "The Postpetition, Pre–Rejection, Pre–Assumption Status of an Executory Contract", 59 *Am.Bankr.L.J.* 197, 220 (1985); *In re Studebaker's of Ft. Lauderdale, Ltd.,* 73 B.R. 217, 219 (Bkrtcy. N.D.Fla.1987); *In re Family Showtime Theatres, Inc.,* 67 B.R. 542, 551 (Bkrtcy.E. D.N.Y.1986); *In re Postle Enterprises, Inc.,* 48 B.R. 721, 725 (Bkrtcy.D.Ariz.1985). It is in this spirit then that the court will analyze the facts and circumstances of the instant proceeding.

█ There is no question that the lease in question is one for nonresidential real estate. (Tr. Ex. 1, 5/19/88). Accordingly, there is no question that if the lease was effectively terminated, as intended by the lessor, on April 30, 1988, some eight weeks before the order for relief, then it may not be assumed by this Debtor regardless of any ability to cure defaults, pay damages or provide adequate assurance of future performance. This is true even if the lease may be categorized as "unexpired." 11 U.S.C. Section 365(c). If terminated, the lease leaves nothing to be assumed. *In re 163rd Street Medical Corp.,* 67 B.R. 499, 500 (S.D.Fla.1986); *In re Talley,* 69 B.R. 219 (Bkrtcy.M.D.Tenn.1986) (distinguishing "expired" from "terminated" in a chapter 13 context); *In re Gooodloe,* 61 B.R. 1016, 1018 (Bkrtcy.M.D.Tenn.1986); *In re Telephonics, Inc.,* 85 B.R. 312 (Bkrtcy.E.D.Pa. 1988).

Section 365(c) directs that the question of termination is to be resolved by reference to "applicable nonbankruptcy law." In this context, "applicable nonbankruptcy law" is state law. *In re Air Vectors Associates,* 53 B.R. 668, 685 (Bkrtcy.S.D.N.Y.1985). By virtue of paragraph 10.4 of the lease *sub judice* the parties here have agreed to the application of Tennessee law to any construction or interpretation of the lease.

Assuming that their terms are not otherwise illegal, Tennessee law unequivocally gives effect to agreements, including leases, as written. *See, e.g., St. Paul Surplus Lines v. Bishops Gate Insurance Co.,* 725 S.W.2d 948 (Tenn.App.1986); *Pizza Pumps of America, Inc. v. Krispy Kreme Doughnut Corp., et al.,* 11 TAM 52–13 (Tenn. App.1986) [available on WESTLAW, 1986 WL 12174]; Tenn.Code Ann. Section 47–50–112(a).[4] Moreover, under Tennessee law, "in the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust." *St. Paul Surplus Lines, supra.,* at 951; *Pizza Pumps of America, Inc., supra,* p. 5; *Ballard v. North American Life and Casualty Ins. Co.,* 667 S.W.2d 79, 82 (Tenn. App.1983). In construing contracts, the Tennessee courts hold that "the intention of the parties as ascertained from the language of the instrument controls." *First American National Bank v. Chicken System of America, Inc.,* 510 S.W.2d 906, 908 (Tenn.1974); *see also, St. Paul Surplus Lines, supra,* 951; *Pizza Pumps of America, Inc., supra,* p. 5. Further, the court cannot make a new contract for the parties but is constrained to interpret the contract as written. *St. Paul Surplus Lines, Id.*

As discussed above, by its agreement to the terms of the lease here, the Debtor covenanted to, *inter alia,* pay rent timely, obtain the lessor's permission for any repairs or alterations to the premises which

---

**4.** Tennessee Code Annotated Section 47–50–112(a):

(a) All contracts, including, but not limited to, notes, security agreements, deeds of trust and installment sales contracts, in writing and signed by the party to be bound, including endorsements thereon, shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written; provided, however, nothing herein shall limit the right of any party to contest the agreement on the basis it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

would cost over $5,000.00, provide the lessor with performance and labor and material payment bonds or a sufficient financial statement, pay promptly when due the entire cost of any work to the premises, and forthwith cause to be discharged of record any lien placed against the premises. (Tr. Ex. 1, 5/19/88). Moreover, the Debtor (tenant) agreed to the following default and termination provisions:

Section 9.2. *Default.* (a) If any of the following shall occur: (i) if Tenant defaults under this Lease and such default continues for five days after service by Landlord of notice on Tenant specifying the nature of such default, in the case of a default in the payment of Rent or other monies, or 10 days, in the case of any other default, or if a nonmonetary default shall be of such a nature that it cannot be reasonably remedied within such 10 days, if Tenant shall not in good faith have commenced the remedying of such default within such 10–day period and shall not thereafter diligently proceed therewith to completion, or (ii) if any levy, execution or attachment shall be issued against Tenant or any of Tenant's property and shall not be vacated within 60 days, or (iii) if the Premises become abandoned, vacant or deserted, of (iv) if Tenant shall default with respect to any other lease between Landlord and Tenant (or any Affiliate of Tenant), then in any such case Landlord may serve upon Tenant a notice that this Lease and the Term will terminate on a date to be specified therein, which shall be not less than five days after the giving of such notice, and upon the date so specified, this Lease and the Term shall terminate as fully as if such date were the date herein fixed for the end of this Lease and the Term, and Tenant shall then quit and surrender the Premises to Landlord ... (Tr. Ex. 1, 5/19/88).

There has been absolutely no proof or assertion that the lease here is the result of fraud or mistake by either party. Both parties are sophisticated and knowledgeable with regard to the modern commercial world and the court harbors no doubt that the lease terms, as written, reflect the parties' intentions.

Mr. Victor was certainly a sophisticated business person. He testified that he was an attorney, although he was evasive about when and where he attended law school as well as where and when he had been admitted to practice.[5] He testified that he earned the certified public accountant's designation, although he was evasive about the nature of his accounting practice.[6] He testified that he made an informed decision to acquire the Memphis T.G.I. Friday's restaurant and that he participated in and even directed some of the negotiations concerning the acquisition documents. The language of the lease and franchise was clear and at no point did Mr. Victor evidence a lack of understanding of the documents or their wording.

It is clearly established by unimpeached evidence that the Debtor is in default of the specific covenants discussed above. Thus, the question becomes whether the lessor adhered to the lease provisions concerning notice of default, cure, and termination and, if so, whether those provisions contravene other applicable state law.

Chronologically, the Debtor's first default was that of failing to obtain the lessor's consent for the renovation of the premises or to provide the lessor with payment bonds for the work to be performed. (Tr. Ex. 1, Par. 7.2(d), 5/19/88). The Debtor was notified of this default by a letter from the landlord dated March 1, 1988. The letter specifically sets forth the elements of this default. (Tr. Ex. 7, 5/19/88). On March 1, 1988, the Debtor failed to pay its rent. This default was specifically pointed out, with instructions to cure same, in a letter from the landlord dated March 16, 1988. (Tr. Ex. 2, 5/19/88 and Tr. Ex. 32, 6/28/88). On March 4, 1988, the reno-

---

5. The court, however, did not consider hearsay evidence consisting of a letter from the state of California, admitted for identification only. (Tr. Ex. 16, 6/28/88)

6. He would not, for example, answer whether his accounting partner, Mr. Kinoshita, was also a certified public accountant.

vation work was stopped at the premises and on March 31, 1988, Vernbrook recorded its lien against the premises. (Tr. Ex. 11, 5/19/88). Also, on March 17, 1988, the Tennessee Department of Employment Security placed a lien against the Debtor's property at the premises. (Tr. Ex. 15, 5/19/88). Neither of these liens have been discharged to date. On April 1, 1988, the Debtor again failed to pay its rent and on April 18, 1988, the landlord sent the Debtor notice of each of these defaults and of its termination of the lease. The notice, in writing, lists each default specifically. (Tr. Ex. 3, 5/19/88).

From these facts, it appears that the landlord complied with the basic lease requirements in rendering its notices of default at least with regard to the required payment bonds and payment of the March rent. Therefore, it became the Debtor's responsibility to cure the defaults within the time allotted by paragraph 9.2 of the lease. Given that default notices were proper, these two defaults alone were sufficient to trigger a notice of termination. In fact, the Debtor's failure to pay the March rent, notice of such, and failure to cure within five days were sufficient to justify the notice of termination. As such, it appears that it would have been relatively easy for the Debtor to cure the defaults by paying the March rent and providing payment bonds for the work to be done as required by the lease terms. This is most significant and belies Mr. Victor's testimony of the Debtor's ability to cure defaults. Such cure action by the Debtor may have prevented the landlord from issuing its notice of termination. However, no cure was made and the court concludes that the landlord was justified in issuing its Notice of Termination. Thus, the question becomes whether these facts and circumstances resulted in actual termination of the lease as a matter of law.

It is argued by the Debtor that, notwithstanding the above events, the lease has not been properly terminated under Tennessee law because termination requires actual re-entry by the landlord, commencement of a suit for possession, or issuance of a writ of possession. For this proposition, the Debtor cites the court to *Matthews, et. al. v. Crofford,* 167 S.W. 695 (Tenn.1914); *In re Glenn,* 760 F.2d 1428 (6th Cir.1985); *Buckner v. Colonial House Apartments,* 64 B.R. 90 (W.D.Tenn.1986); and *In re Talley,* 69 B.R. 219 (Bkrtcy.M.D. Tenn.1986).

Each of these cases is readily distinguishable from the proceeding at bar in the first instance because they involve residential real estate. Unlike the proceeding *sub judice,* the cases cited by the Debtor involve a determination of when a Debtor's leasehold or freehold interest in residential real estate is "expired" or "forfeited" rather than a determination of when a nonresidential lease is "terminated" for purposes of Section 365(c). Accordingly, these cases stand for the proposition that a freehold interest is not forfeited prior to a foreclosure sale and that a lease is not "expired" prior to the issuance of a writ of possession pursuant to Tennessee law and when, for purposes of Section 365(a) of the Bankruptcy Code, the subject property is residential. *In re Glenn, supra; Buckner, supra;* and *In re Talley, supra.* Moreover, the *Talley* case, as well as this District's *Burk Hall Company* case, *supra,* involve leases that contained language which equated "default" with "expiration" or "termination." In contrast, the lease at issue here requires specific notice and reasonable time for cure prior to termination.

The Debtor has also directed the court's attention to the case of *In re Windmill Farms, Inc.,* 70 B.R. 618 (9th BAP 1987) in support of its position that a lease may not be terminated due to a lessee's violation of lease default provisions simply by notice of such. However, the *Windmill* case involves construction and application of California law. As set forth above, the parties in the instant proceeding have agreed to the application of Tennessee law with regard to any construction or interpretation of the lease at issue. Thus, the court concludes that the present lease must be construed in accordance with Tennessee cases involving similar leases of commercial property, and that the residential lease, or other state law, cases are not controlling.

The apparent leading case in this regard in Tennessee is *Nashville Record Productions, Inc. v. Mr. Transmission*, 623 S.W. 2d 281 (Tenn.App.1981), *cert. denied.* In that case, a lease agreement concerning nonresidential real property provided the lessee with ten days to cure any violations of its terms before the lessor could elect to declare the lease *"forfeited* and at an end, and to *re-enter* and *take possession of the premises ..." Id.* at 282. After several instances of failure by the lessee to pay rent or to do so timely, the lessor notified its lessee that it declared the lease forfeited. At issue was whether the common law requirements for demand of rent could be abrogated by the agreement of the parties. *Id.* In reliance on the legal premises discussed above that contracts are assumed to evidence the parties' intentions and are to be construed as written, the Court held that such a demand could in fact be abrogated. *Id.* at 283.

Moreover, the *Nashville Record* Court reasoned that:

'[t]he lessor ordinarily may terminate the lease pursuant to a forfeiture clause contained therein, for lessee's breach of covenant as to payment of rent.' (citation omitted) ... In the modern commercial world when a lessor is not paid and has so contracted with a competent lessee, the lessor is entitled to *possession of the premises* after reasonable efforts to require the lessee to cure. A 'ten day cure' clause is reasonable. It prevents an automatic forfeiture which is not favored by the courts because of its harshness. *Id.* (Emphasis added).

This line of reasoning was reiterated in the 1986 *Pizza Pumps of America* case, *supra.* There, the Tennessee Court of Appeals was faced with a commercial lease which provided that no notice of default or opportunity to cure was required for the lessor to treat the lease as forfeited when rental payments were overdue. The Court held that the lease was to be construed as written and as such, the lessee had "lost all legal interest in the lease by forfeiture in not paying the rent on time." *Pizza Pumps of America, Inc. v. Krispy Kreme Doughnut Corp., et al., supra,* p. 6.

The obvious conclusion to be drawn from these cases is that in Tennessee a commercial lease is to be construed and enforced as written. In addition, these cases clearly illustrate that a commercial lease may be terminated by the lessor for good cause regardless of possession. It is only upon failure of the lessee to surrender the premises pursuant to a notice of termination in accordance with the lease terms that a commercial lessor may be required to file an unlawful detainer or ejectment action. In fact, it has been held that where a lessee remains in possession following default and consequent termination of the lease, the lessee is a "tenant at sufferance" of the lessor. *See, e.g., In re Maxwell,* 40 B.R. 231, 237 (N.D.Ill.1984); *Metropolitan Life Ins. Co. v. Moore,* 167 Tenn. 620, 72 S.W.2d 1050, 1051 (1934).

Application of the foregoing conclusions of law to the facts thus far established yields a strong indication that the lease at issue here was terminated prior to the order for relief. However, given that the property which is the subject of the lease is apparently necessary to the Debtor's reorganization, the underlying factual events are critical, and the credibility of the witnesses and proof put forward by the Debtor is an important element. The lessor, OSP, established a clear prima facie case of default through its documentary evidence as well as testimony at the May 19, 1988, hearing. The proof in response by the Debtor failed to rebut the proofs of default.

The primary witness called by the Debtor was Les Victor, the President and Chief Executive Officer of Maruki U.S.A. Co., Inc. The other witness for the Debtor was Robert Burzo, a regional manager who was credible but who lacked significant knowledge of the financial status of Maruki U.S. A. Co. Inc., Maruki Tennessee "F," Inc., or the Debtor.

By both his general demeanor and by his evasive responses, Mr. Victor established himself as a witness without credibility in this proceeding. Mr. Victor would not directly and forthrightly answer most ques-

tions put to him. He, as a witness, questioned the relevance of certain inquiries and would not respond without direction from the court. He would not respond to factual inquiries which were clearly within the realm of his knowledge and ability to either admit or deny. He evidenced lack of respect for opposing counsel and remained arrogant and defiant throughout two days of testimony.

With the critical issues involved, Mr. Victor's responses were surprising. For example, to an inquiry concerning a plumber's lien of $11,000.00, he responded that the amount was not significant and if owed, "we will pay it." To questions concerning Maruki U.S.A's net worth, he replied that it "was many, many, many times what is necessary to satisfy any debts for Fridays." To an inquiry concerning a Heller Financial $600,000 security instrument, Mr. Victor first claimed a privilege to responding because of a pending lawsuit by Heller and then claimed inability to identify his signature on the document because it was a copy. He did not know if tax returns had been filed. To an inquiry concerning $38,000.00 rent owed on another related entity's Memphis restaurant, he replied that he was unsure of the amount but that it was "nothing consequential." He denied receiving advice concerning the bonding procedure, yet also testified that he offered to "bond off" the Vernbrook lien. These few examples support the conclusion that the totality of the Debtor's proof was unconvincing.

The court finds that the documentary evidence shows that notice of default on the rent was mailed to and received by the Debtor. (Tr. Ex. 32, 6/28/88). The notice was proper under the lease and addressed to the Debtor as provided for in the lease. Mr. Victor testified that the mailing address of Victor and Kinoshita had been changed and notice given to OSP of that change. Thus, he implied that the notice of default may be improper. However, on April 21, 1988, a letter from Mr. Victor to OSP bears the same return address for Victor and Kinoshita to which OSP's default letter was mailed on March 16, 1988. (Tr. Ex. 8, 5/19/88).

Mr. Victor and the Debtor infer and allege that the real motive behind the actions of OSP is a desire to take the profitable restaurant from the Debtor and to presumably operate it for OSP's benefit. The court has seen no evidence of that motive. The only OSP motive apparent to this court is the understandable desire to receive the benefit of its lease bargain with the Debtor, namely the lease rentals and other obligations. There is a salient factor which also contradicts Mr. Victor's bold allegations. Mr. Victor is a five percent owner of the landlord, OSP and therefore Mr. Victor was in a position to know of and influence OSP's decisions.

The testimony revealed that Mr. Tom Flexner of OSP was at one point an employee of Maruki U.S.A. Co., Inc.; although Flexner stated that he agreed to work for Maruki as an assistant to the accounting firm supervising Maruki. Flexner and Victor have been business associates in other transactions, and Victor was given and took the opportunity to be a minority partner in OSP. If OSP wished to wrongfully deprive the Debtor of its lease, Mr. Victor was in a position to demand that OSP keep him advised, as a partner of OSP. The reality is apparent to the court that the business relationship between Victor and Flexner, Victor and OSP, and Victor and others related to OSP has deteriorated to one of distrust. Nevertheless, this court may not presume, without evidence, that a lack of proper motive caused OSP to deprive the Debtor of its lease. Rather, the evidence is clear that the Debtor and Mr. Victor solely acted to deprive the Debtor of the lease. The court refuses to be misled by accusations when the facts are clear to guide the court. This court is not called upon in this proceeding to determine the propriety of the relationship between OSP, its partners and Mr. Victor. This court only has before it the questions presented by Section 362 and 365.

Mr. Victor testified that he had made several offers to settle the disputes with the landlord. The court permitted the testimony because of the serious issues related to whether the lease had been terminated

prior to the order for relief. Federal Rules of Evidence 408. No evidence to support Mr. Victor's testimony was offered. The court finds that only one offer of settlement was made, that being on the eve of the Chapter 11 filing. If Mr. Victor were correct in his testimony, this important evidence could have been established.

The equities do not favor this Debtor, nor does the court find clean hands on this Debtor. The bankruptcy court is a court of equity. *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). "It is, however, a court of equity under the law." *In re Costell,* 75 B.R. 348, 353 (Bkrtcy.N.D.Ohio 1987). The equity of the court does not reach to this Debtor, especially in view of the mandate of the Code. 11 U.S.C. Section 365(c)(3). As Justice White recently observed for the unanimous court in *Northwest Bank Worthington v. Ahlers,* ── U.S. ──, 108 S.Ct. 963, 968–969, 99 L.Ed.2d 169 (1988):

> [w]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.

This court reads this dicta at least to be a caution that the bankruptcy court may not ignore clear and specific language of the Code.

Because the termination was effective under nonbankruptcy law on April 30, 1988, the date of the order for relief is critical. Had this been a proper voluntary filing, the order for relief would have been simultaneous with the filing date, which was also April 30, 1988. See this court's *Memorandum Opinion and Order,* 88 B.R. 821, (1988); 11 U.S.C. Section 301. However, the court has previously ruled, in its June 7, 1988 opinion, that the order for relief was not entered in this involuntary case until compliance with Section 303(h) of the Code. The lease was terminated prior to the entry of the order for relief, and there is no provision in the Code for an order for relief in an involuntary case to relate back to the filing date of the involuntary petition. Such a concept would not comport with Sections 303(h) or 365(c)(3).

It may be argued that Section 108(b)[7] would extend the time for this Debtor to assume the lease, beyond the order for relief. However, Section 108(b) was derived from the Bankruptcy Act, Section 11, while Section 365(c)(3) is a part of the 1984 Amendments to the Code. *See generally,* Bkr.L.Ed. *Code Commentary and Analysis,* Section 11.71. Section 365(c)(3) is specific and directed to a particular genre of lease; whereas Section 108(b) is addressed to a general extension of time for the trustee or debtor in possession. The court concludes that the newer, specific Section 365(c)(3) governs over the older, more general Section 108(b). "It is a well established maxim of statutory interpretation that when Sections of an act can be construed consonantly, they should be so interpreted." *I.T.T. Small Business Finance Corp. v. Frederique,* 82 B.R. 4, 6 (E.D.N.Y. 1987), *citing,* Sutherland *Stat. Const.* Sections 51.01, 51.02 (4th Ed.). However, a consonant reading may not always be possible. In *Bank of Commonwealth v. Bevan,* 13 B.R. 989 (E.D.MI.1981), the District Court construed Section 108(b) to be more specific than Section 362(a) and thus Section 108(b) limited the automatic stay in that case. *Id.* at 994. However, in the case of Memphis–Friday's, Section 365(c)(3) is more specific and limiting than Section 108(b). In *In re Eldorado, Inc.,* 85 B.R. 555, 557 (Bankr.D.Mont.1987), the court reasoned that Section 108(b) did not act to extend time for curing of pre-bankruptcy defaults in executory contracts. This is consistent with the Seventh Circuit in *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1215 (7th Cir.1984), *cert. denied,* 469 U.S.

**7.** Section 108(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim, or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) 60 days after the order for relief.

982, 105 S.Ct. 386, 83 L.Ed.2d 321. As the *Moody* court observed:

> Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here.

*Id.; see also* ftn. 15, at p. 1215, where the *Moody* court observed that application of Section 108(b) would "cause irreconcilable conflict between the two sections," citing *Johnson v. First National Bank of Montevideo*, 719 F.2d 270 (8th Cir.1983), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).[8]

Additionally, Congress clearly was aware of the existence of Section 108(b) when the 1984 Amendments were enacted; therefore, the omission of any reference to Section 108(b) is significant. Section 365(c)(3) was designed to address commercial landlord concerns, and this court may not defeat those purposes by overextending Section 108(b). "The Code embodies the competing interests of debtors and creditors." *In re Farmer*, 81 B.R. 857, 860 (Bkrtcy.E. D.Pa.1988). Here, the Code dictates that the creditor's interests prevail.

Further, the language of 11 U.S.C. Section 108(b) refers to extensions of time which have "not *expired* before the date of filing of the petition," as contrasted to the language of Section 365(c)(3) that an unexpired *nonresidential* lease may not be assumed if it "has been *terminated* ... prior to the order for relief." (Emphasis added). As already noted, the distinction between "expired" and "terminated" is significant. Section 108(b) is limited in its scope to unexpired time periods. *See, In re Martinson*, 731 F.2d 543, 544 (8th Cir.1984). Section 108(b) may not be used indiscriminately for the "impermissible creation of a property right." *Matter of Tynan*, 773

F.2d 177, 180 (7th Cir.1985). In view of this court's conclusion on the nonbankruptcy termination of the Debtor's lease, application of Section 108(b) would be artificial and unwarrantable.

The reality is that no lease remains for assumption under Section 365(c)(3). "If a contract has been terminated prebankruptcy, there is nothing left for the debtor to assume. However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law." *Moody v. Amoco Oil Co., supra,* at 1212; *see generally* 1 Norton, *Bankruptcy Law & Practice*, Section 23.11.50 ff. If the facts and state law in the instant case presented the Debtor with any rights to reverse the termination, Section 108(b) could be applicable as to time limits. But the involuntary Chapter 11 filing "cannot resuscitate a reversal of rights fully terminated." *In re Eldorado, Inc., supra,* at 557.

### ADEQUATE ASSURANCE AND CURE OF LEASE

■ In order to fully assess the Debtor's rights under the Code, the court has considered whether the Debtor has complied with Section 365(b)(1).[9] To reach this consideration, the court would be required to find that an unexpired lease existed for assumption by the Debtor, and the court has found and concluded that there is no lease for assumption. However, for purposes of a complete analysis and record, the court will assume that a lease still existed. In such an event, Section 365(b)(1) has not been satisfied by this Debtor and the court will conclude that even if an unexpired lease existed, the Debtor has failed to carry its burden under the Code of

---

**8.** The *Moody* opinion results in Section 365(b)(1)(A) allowing more time for the debtor to assume or reject than Section 108(b) would have permitted for curing. Thus, the result in *Moody* is not the same as in Memphis–Friday's. However, the rationale of *Moody* that the specific provisions of Section 365 are controlling is applicable here.

**9.** Section 365(b)(1)—If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such

contract or lease unless, at the time of assumption of such contact or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

providing cure, paying damages, or providing adequate assurance of future performance. Therefore, the Debtor would be unable to assume the lease if such were available for assumption.

The court reached this conclusion after a consideration of all of the evidence, including the testimony of the Debtor's representative, Les Victor. The major factual findings involved in the court's conclusion include:

Mr. Victor testified over two days of hearings. On direct examination by Debtor's counsel, no evidence was produced or even suggested concerning curing of default, payment of damages, or adequate assurance of future performance, except Mr. Victor's response to general inquiry to the effect that he would abide by lease provisions concerning satisfaction of liens, that he would not permit further default and that Maruki "of course" stood ready, if called upon, to honor its guaranty of the lease obligations. This is not adequate assurance. It is mere bravado.

Had counsel for the lessor and franchisor asked no cross examination, there would have been no evidence of cure or of future assurance in the record. The Debtor has the burden of proof under Section 365(b)(1) and the Debtor failed to carry its burden during direct or cross-examination. Mr. Victor testified further concerning his intentions to cure but again no significant or solid evidence to support his statements was offered. Rather, only generalities such as Maruki's possession of "more than sufficient funds to cure defaults" were offered. The court may only conclude that no real evidence exists.

The mystifying factual question in this proceeding is: Why would the Debtor take the risk of allowing a breach of the lease and franchise if the Memphis–Friday's restaurant was as profitable as Mr. Victor testified? Mr. Victor stated that the restaurant had an annual profit in excess of $200,000.00; yet the only real testimony concerning why the Debtor permitted the Vernbrook lien to be placed on the property was that the Debtor had "questions" about the sufficiency of Vernbrook's documenta-

tion of invoices and about compliance of the Vernbrook work to specifications. No evidence of deviation from the requirements was offered and only $1,800.00 in disputed invoices was described. Over these "questions" Mr. Victor and the Debtor permitted a lien of $117,164.47 to be filed and presumably permitted the restaurant to remain closed. The alternative of posting a performance bond was known to Mr. Victor and no credible testimony was offered as to why a bond was not posted. The Debtor's explanations of its actions were weak if existent at all, and the court is left with absolutely no evidence to support the Debtor's actions.

Mr. Victor testified that the 1987 regional profits of Maruki's restaurants was $700,000.00. If that were true, and no documents were offered to support it, why were those profits not tapped prior to the bankruptcy filing to cure lease defaults and reopen Friday's? Or, why were those profits not dedicated to post-filing cures and adequate assurance? Mr. Victor said the remodeling was ninety percent complete and that approximately two weeks' work was needed for completion. If that is true, why were the resources of Maruki not committed to completion before the lease and franchise were irreparably breached?

Mr. Victor testified that, given the opportunity by this court, Maruki will guarantee all defaults, cure them as ordered by the court and reopen the restaurant. Bold statements do not substitute for factual proof. If Maruki and the Debtor possess the ability to provide adequate financial assurances, the same could easily be demonstrated. Financial statements, tax returns, bank statements, letters of credit, loan commitments, bonds, as well as cash are some of the evidence of adequate assurance which could have been offered. None were. Mr. Victor testified on cross examination that he brought no records because he assumed that his testimony would be sufficient. The Code requires adequate assurance of future performance. The unsubstantial promises of the Debtor are insufficient. *See, e.g., In re Eldorado, Inc., supra,* at 557–558. The testimony of

Mr. Victor was far less than substantial proof of adequate assurance.

### T.G.I. FRIDAY'S, INC. FRANCHISE

■ Having found that the commercial lease was terminated prior to the order for relief and that the Debtor failed to satisfy Section 365(b)(1), the court has examined the franchise agreement between the Debtor and T.G.I. Friday's, Inc. and has concluded that the Debtor's legal inability to assume the lease renders the assumption of the franchise an impossibility. Not only does sufficient evidence exist of the Debtor's defaults in the franchise agreement and of the Debtor's lack of proof on curing those defaults, the reality is that adequate assurance of future performance of the franchise cannot be offered by this Debtor. The franchise agreement specifically refers to and is tied to the specific location in Overton Square for the Memphis Friday's. (Tr. Ex. 12, 6/27/88). It is true that a second future Memphis restaurant location is provided for, but this executory franchise is not severable. Therefore, there being no assumable lease, there can be no assumable franchise.

■ Disregarding that reality for discussion purposes, would the franchise be subject to assumption under Section 365 if the lease issues were not present? The answer is no. The proof failed for the Debtor here also. The evidence of default in the franchise includes default in royalty payments (Tr. Ex. 12, paragraphs 11 & 15, 6/28/88); default in maintaining the restaurant to required standards (Tr. Ex. 12, paragraph 7, 6/28/88; see also Tr. Ex. 18 & 27, 6/28/88); failure to use the Debtor's best efforts in remodeling the restaurant (Tr. Ex 12, paragraph 2 & 3; and Tr. Ex. 18, 6/28/88); and failure to use best efforts in re-opening the restaurant (Tr. Ex. 12, paragraph 3 and Tr. Ex. 27, 6/28/88). The Debtor's proof consumes itself. The Debtor alleges and its principal witness emotionally states that it was anxious to re-open the restaurant and that it possessed the financial ability to realize that goal. Yet, the Debtor afforded no plausible explanation for why it failed to use those financial resources in curing the defaults prior to April 30, 1988.

### VERNBROOK RELIEF FROM STAY

■ Because of the court's findings and conclusions as to OSP and Friday's, Inc., the court will grant relief from the stay to permit Vernbrook to pursue its state Chancery Court litigation against all named defendants, including this Debtor (See Tr. Ex. 12, 5/19/88). In that suit, Vernbrook attempts to enforce its mechanic's and materialmen's lien and the questions raised therein are state law in nature. As a result of this court's decision herein of the state court defendants, only this Debtor is subject to this court's core jurisdiction and the property subject of the state court suit is no longer property of this estate. 11 U.S.C. Section 541(b)(2). The stay no longer restricts enforcement actions of the lessor. 11 U.S.C. Section 362(b)(10). If the lessor is required to take further actions to obtain possession, they will be taken in state court. Therefore, this court has no reason in fact or under the Code to prevent the lien suit from proceeding in state court.

### CONCLUSION

This court was asked by the Debtor to give the Debtor an opportunity to cure *all* defaults, without the Debtor first admitting *any* default. The Debtor put the burden on the court to fashion a cure amount, method and assurance. This burden is the Debtor's. The court acts in a judicial not an administrative function. The proper role of the court under Section 365(b)(1) is to hear the proof and see if it measures up to the Code. "The court is not obliged to fashion *sua sponte* a mechanism which it believes will adequately protect the secured creditor." *In re Monroe Park, D.C.*, 17 B.R. 934, 941 (D.Del.1982) (citations omitted). This Debtor offered no substantial and little credible proof. Therefore, the court must conclude that the Debtor has failed to satisfy Section 365(b)(1) as to either the lease or franchise.

Moreover, the court has concluded that the lease was terminated before the order for relief. The unusual procedural filing

circumstances would not alter the harsh result. Had this case been properly and initially filed as a voluntary petition, with the result that the order for relief was concurrent with the filing, the end result would be the same, given the court's conclusion under Section 365(b)(1). However, there simply is no existing lease to assume. In view of the applicable Tennessee law considered under Section 365(c)(3), this court is comfortable with the conclusion that if this were a Tennessee state equity court, that court would say that this lease was terminated on April 30, 1988.

With the termination and non-assumability of the lease so goes the franchise. The court is aware that this severe result effectively ends the reorganization effort of this Debtor. However, the bankruptcy court does not bear the responsibility of guiding a debtor to success; rather, the court enforces the opportunities which the Code permits. The Code does not permit this Debtor another opportunity. The franchisor is entitled to and is granted relief from the stay for "cause" under Section 362(d)(1) because of the Debtor's inability to assume the lease and franchise. *See, In re B–K of Kansas, Inc.,* 69 B.R. 812 (Bkrtcy.D.Kan.1987).

Vernbrook, Inc. is entitled to relief from the stay to pursue its state court action against numerous defendants, including this Debtor. Because that suit involves parties not before this court and property which is no longer property of this estate, the court concludes that the state action would not be core under 28 U.S.C. Section 157(b)(2). As to this Debtor, any state court determination as to damages, if any, may not be enforced against this Debtor without first seeking further relief from the stay by this court.

If any additional actions are required for the landlord to obtain possession, the same will be taken in state court. 11 U.S.C. Section 362(b)(10). OSP and Friday's, Inc. may certainly have damage or other claims, including attorney's fees, against this Debtor. *See, e.g., Nashville Record Production v. Mr. Transmission, supra,* and *Pizza Pumps of America, supra.* Such claims may be filed in this court and the Debtor will have its opportunity to object. Bankruptcy Rule 3007.