**In re GATEWAY INVESTORS, LTD., Debtor.**

**Bankruptcy No. 89-05510.**

United States Bankruptcy Court, D. North Dakota.

Feb. 7, 1990.

Jon Brakke, Fargo, N.D., for debtor.

Roger Minch, Fargo, N.D., for Kavaneys.

David T. Demars, Fargo, N.D., for North Bismarck Assoc.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a Motion to Assume Unexpired Leases filed on November 30, 1989, by the Debtor, Gateway Investors, Ltd. The Debtor seeks to assume six ground leases upon which the Gateway Shopping Center in Bismarck, North Dakota is situated. The motion is objected to by Martha Kavaney, Richard Kavaney, Charles Kavaney, John Kavaney and James Kavaney, as lessors and North Bismarck Associates as mortgagee of the leasehold interest. Both the Kavaneys and North Bismarck Associates object to the motion to assume the leases on the grounds that said leases were terminated prior to the Debtor's filing of bankruptcy or in the alternative that the Debtor fails to meet the requirements of prompt cure pursuant to 11 U.S.C. § 365. In addition, North Bismarck Associates has filed a motion for relief from stay in order to permit a declaratory judgment action pending in the District Court of Burleigh County, North Dakota, to determine the rights of the respective parties under the ground leases.

### 1.

The Debtor, Gateway Investors, Ltd. (Gateway), is a California limited partnership whose principal business activity is the

ownership and operation of the Gateway Shopping Center in Bismarck, North Dakota. Gateway's general partner is known as First Equity Group whose president is Donald Bergman. First Equity Group's former president was one Richard Magers who resigned on June 6, 1989, at the request of Mr. Bergman, because of some possible misdealings. Mr. Bergman is also president and chief executive officer of Beverly Hills Capital, a subsidiary of the Bank of Beverly Hills. The Bank of Beverly Hills has footings of $170,000,000.00 and Mr. Bergman is on the Board of Directors.

The Gateway shopping development is situated upon approximately fifty acres of land. The Gateway Shopping Mall has a total of 330,000 square feet with 290,000 square feet rentable. The core area of the mall and the outlet development were constructed in 1979 by Bismarck Development Corporation. At present, the Gateway Mall has approximately fifty tenants with a 97% occupancy rate. The land upon which the Gateway Mall was initially developed is owned in fee by Martha Kavaney, Richard Kavaney, Charles Kavaney, John Kavaney, James Kavaney (Kavaneys) and is described as follows:

> Lot One of Block One, Lot Two of Block One, Lot Three of Block One, Lot Four of Block One, Lot Five of Block One, Lot Six of Block One, Lot Seven of Block One, and all of Lot Eight except a portion thereof of Block One, all being a part of the Re-plat of Kavaney Commercial Park located in the City of Bismarck, County of Burleigh, State of North Dakota.

On October 4, 1979, the Kavaneys entered into eight separate ground leases on the above-described real property with Bismarck Development Corporation. Each of the ground leases were for fifty year terms with five additional ten year renewal options. The leases were drafted by Richard Kavaney, a then third-year law student, and Bruce Thompson, an investor in Bismarck Development Corporation. Bismarck Development Corporation as ground lessee subsequently sub-leased their interest in the property to North Bismarck Associates (NBA), a North Dakota general partnership. In 1978, the Kavaneys, Bismarck Development Corporation and NBA executed and delivered to First National Bank of Minneapolis a first mortgage on the subject real property to secure repayment of the sum of $8,200,000.00 which was utilized to construct the shopping center. In 1980, First National Bank of Minneapolis assigned its interest to the present fee mortgagee, Great West Life Assurance Company. After operating the mall for approximately four years, Bismarck Development Corporation and North Bismarck Associates sold and conveyed their rights under the six ground leases to Gateway Investors Ltd. on April 30, 1984. NBA acquired a mortgage on Gateway's leasehold estate in order to secure the purchase price of $2,600,000.00 plus interest. A third mortgagee also exists whose interest is subordinate to NBA and is only known to the court as "third party note holders."

Gateway has been operating the mall since 1984. Sometime in 1979 the Cowgill–Olson Agency took on the day-to-day management functions of the mall. The manager since Gateway Mall's inception has been Denis Olson and he remains so today.

In early 1989 the Gateway Shopping Center negotiated the sale of two outlots to Dan's Super Value, a tenant at that time. The sale occurred on March 22, 1989, and the agreement provided that Dan's Super Value would pay approximately $800,000.00 for Lots Five and Six of Block One. The property that was sold to Dan's Super Value was covered by two of the 1979 ground leases. Neither party produced evidence to demonstrate exactly what happened to the proceeds of that sale, except that it appears the Kavaneys received $200,000.00. After the sale of Lots Five and Six of Block One to Dan's Super Value, the remaining six ground leases, which are presently the subject of this motion, cover the following described real property:

> Lots One, Two, Three, Four, Seven and Eight, Block One, Re-plat of Kavaney Commercial Park to the City of Bismarck, Burleigh County, North Dakota.

In early 1989, the Kavaneys discovered that Gateway had failed to pay the 1987 and 1988 real estate taxes due to the Burleigh County Treasurer's office. The tax arrearage at present totals $671,954.62. In addition, the first half of 1989 taxes are due in the amount of $163,500.00. It is undisputed that the ground leases provide that the real estate taxes were to be paid by the tenant as additional rent. *See* ¶ 4.3. Therefore, it was Gateway's obligation to pay the taxes upon the leased premises as additional rent. The payment of the real estate taxes by Gateway would then, in turn, obligate certain retail tenants to pay their share of such real estate taxes. Since Gateway was in default on these taxes the retail tenants have not paid Gateway their share.

Approximately two or three months after learning of the tax arrearages, the Kavaneys sought to terminate the ground leases with Gateway. Therefore, on April 26, 1989, the Kavaneys through their attorney Russ Mather sent Notice of Default of Ground Leases, return receipt requested to Gateway Investors at a California address, North Bismarck Associates, Great West Life Assurance Company, and the retail tenants of the Gateway Shopping Center. In addition, the Kavaneys served the Notice of Default, return receipt requested, on Mr. Denis Olson who was the registered agent of Gateway Investors, Ltd. and manager of the shopping center. Mr. Olson testified that he did not consent to nor was he aware that he was registered agent of Gateway Investors. The notice sent to Gateway Investors at the former California address was apparently never received. Mr. Olson testified that upon receiving the notice of default he tried to contact Mr. Richard Magers who was president of First Equity Group. Olson testified that he sent the notice of default to Magers by Federal Express, but Gateway did not cure the default. On May 19, 1989, the Kavaneys sent Notice of Termination of Ground Lease, return receipt requested, again to Mr. Olson, the former Gateway address, North Bismarck Associates, Great West Life Assurance Company, and all retail tenants. Mr. Olson sent the notice of termi-

nation by Federal Express to Gateway and again attempted to contact Mr. Magers to receive some guidance, but did not receive a response. On June 13, 1989, Mr. Olson learned that Mr. Magers had resigned from First Equity Group apparently because of some misdealings, and that his new contact person would be Mr. Donald Bergman.

On June 12, 1989, as the result of an action filed by NBA, the Gateway Mall was placed in state receivership and Mr. Olson, as current manager, was appointed receiver. On June 30, 1989, Gateway Investors, Ltd. filed for relief under Chapter 11 of the Bankruptcy Code.

### 2.

As a result of the Debtor's Motion to Assume the Ground Leases, the issues before the court are twofold. The logical order of the issues is:

1. Were the subject ground leases between the Kavaneys and the Debtor, Gateway Investors, properly terminated? If not,

2. Does the intended assumption of the ground lease by the Debtor, Gateway Investors, satisfy the requirements of 11 U.S.C. § 365?

The ground lease agreements provide the circumstances and proper procedure for termination. It is undisputed the lease agreement provides for the tenant to pay the real estate taxes, as additional rent, and therefore the non-payment of such taxes would result as an "Event of Default" as described in the lease agreements. *See* ¶¶ 4.3(a) and 11.1. Upon such "Event of Default" the lease agreement further provides that the landlord may notice such default. Paragraph 11.2 of the lease agreement provides:

11.2. *Notice of Default.* Upon the occurrence of an Event of Default, Landlord may serve upon Tenant, pursuant to ¶ 12.1, a notice of default, which shall specify in detail the claimed default, which notice of default shall also be served upon any mortgagee and no such notice shall be effective as a notice of default unless a copy of such notice is

served upon any mortgagee of which Landlord has notice pursuant to ¶ 12.1, and such notice as strictly complies with ¶ 11.2.

The lease agreement further provides that if the tenant remains in default and if the Notice of Default was sent in accordance with ¶ 11.2, the landlord may then serve the "Notice of Termination" advising the tenant that unless the precise default specified in the Notices of Default and Termination are not cured within fifteen days the term of the ground lease shall expire. *See* ¶ 11.4.

In addition to the above-mentioned notice provisions regarding termination, the lease agreement in pertinent part further provides under the heading "Leasehold Mortgage":

> 7.3(b) *Notice to Landlord.* Upon the placing or assignment of a Leasehold Mortgage, Tenant or the Leasehold Mortgagee, shall notify Landlord, and any Fee Mortgagee of the address of the Leasehold Mortgagee to which notices shall be sent. So long as a leasehold mortgage is in effect as to which such notice has been given, no *termination,* alteration, amendment or modification of the Ground Lease shall be made without the prior written consent of such leasehold mortgagee. Tenant agrees to furnish to Landlord a copy of any Leasehold Mortgage and any assignment thereof within thirty (30) days of making same. 7.3(b) (Emphasis added).

### 3.

■ The determination of whether the Kavaneys complied with ¶ 7.3(b) raises questions of contract interpretation and construction. The primary goal of the court in interpreting and construing a contract is to give effect to the mutual intentions of the parties. *National Bank v. International Harvester Company,* 421 N.W.2d 799, 803 (N.D.1988); *Metcalf v. Security Intern. Insurance,* 261 N.W.2d 795, 799 (N.D.1977); N.D.Cent.Code § 9–07–03 (1987). In interpreting a written contract, the intentions of the parties are to be ascertained from the writing alone, if

possible. *Olson v. Peterson,* 288 N.W.2d 294, 296 (N.D.1980); N.D.Cent.Code § 9–07–04 (1987). Furthermore, the language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity. N.D.Cent.Code § 9–07–02 (1987). Finally, it is a cardinal principle of contract interpretation that the court should construe a contract most strongly against the party who prepared ˙it, and who presumedly looked out for his best interest in the process. *Graber v. Engstrom,* 384 N.W.2d 307, 309 (N.D.1986); *Ray Company, Inc. v. Johnson,* 325 N.W.2d 250, 252 (N.D.1982); *The Farmers Union Grain Terminal Association v. Nelson,* 223 N.W.2d 494, 497 (N.D.1974) N.D.Cent.Code § 9–07–19 (1978). It is with these principles in mind that the court will interpret the requirements of ¶ 7.3(b) of the ground leases.

### 4.

■ Initially, Gateway asserts that the Notices of Default and Termination were ineffective. Gateway contends that the notices were ineffective because they were sent to a former California address of Gateway. However, the Kavaneys also sent the subject notices to Gateway's registered agent, Denis Olson. Pursuant to the ground lease, if a "notice or other communication" is sent return receipt requested to the address listed in ¶ 1.3, notice is deemed given when mailed. *See* ¶ 12.1. However, Gateway did not list its address on the lease nor change its address as suggested by ¶ 12.1. Moreover, while Mr. Olson may have not consented to his role as registered agent, once receiving the notices he acted as such agent by trying to contact Mr. Magers. Olson's testimony was that he forwarded the Notices of Default and Termination to Mr. Magers in hopes that he would receive some guidance on how to handle the default situation. Olson sent Notices of Default and Termination via Federal Express to Gateway and he received nothing that would suggest Magers did not receive the documents. Therefore, the court finds that service on Mr. Olson as registered agent and his forwarding of such notices via Federal Ex-

press to Mr. Magers constituted effective notice.

### 5.

■ Pursuant to the ground lease, ¶ 7.3(b) places two obligations on a tenant or leasehold mortgagee. The first obligation is that upon the placing of the leasehold mortgage the tenant or leasehold mortgagee shall notify the landlord of the leasehold mortgagee's address. If either the tenant or leasehold mortgagee notifies the landlord of the leasehold mortgagee's address then the landlord must obtain "prior written consent" of the leasehold mortgagee in order to make a termination, alteration, amendment or modification of the ground lease. The second obligation contained in ¶ 7.3(b), which is independent of the first, is that either the tenant or the leasehold mortgagee must provide the landlord with a copy of the leasehold mortgage within thirty days. Therefore, prior consent from the leasehold mortgagee is not contingent upon receiving a copy of the leasehold mortgage, but simply the address of the leasehold mortgagee.

The Kavaneys assert, through the testimony of Richard Kavaney, that they were never notified of the address of NBA as leasehold mortgagee and therefore, did not have to obtain NBA's consent in order to terminate the ground lease. While Attorney Mather did testify that he felt he had received some prior written consent, it was more in the nature of something implied from written pleadings of North Bismarck Associates which were filed after the Notice of Termination. Gateway asserts that it would be absurd for the Kavaneys to suggest that they did not have notice of NBA's leasehold mortgage. However, even if the Kavaneys did have notice of North Bismarck Associate's leasehold mortgage that is not what is required by ¶ 7.3(b). Paragraph 7.3(b) requires that the *address* of the leasehold mortgagee be provided to the landlord before the landlord is obligated to obtain prior written consent from such leasehold mortgagee.

The lease agreement provides the proper procedure for giving notice or other communications which are to be given under the Ground Lease. Article XII ¶ 12.1 provides:

> 12.1. *Notices.* All notices, requests, demands or other communications which may be or are required or permitted to be served or given hereunder (in the Ground Lease collectively called "Notices") shall be in writing, and shall be sent by registered mail, return receipt requested, postage prepaid, to Landlord, or Tenant as the case may be, at the respective address set forth in ¶ 1.3, and to any mortgagee entitled to notice hereunder at the address of which such mortgagee has given notice pursuant to this ¶ 12.1. Either party and Mortgagee may, by given as aforesaid, change its address for all subsequent notices. Notices shall be considered given when mailed in accordance herewith. Any purported notice shall be treated as a "Notice" hereunder only if such notice strictly complies with this ¶ 12.1 and all other relevant provisions of the Ground Lease.

The testimony from Richard Kavaney was that no such notice of address of North Bismarck Associates as leasehold mortgagee was received. Nor did NBA or Gateway introduce evidence that such notice of address was sent to the Kavaneys return receipt requested. Paragraph 12.1 explicitly states that such "Notice" will not be recognized unless the Notice strictly complies with the provisions of ¶ 12.1.

■ Whether a contract is ambiguous is a question of law for the court to decide. *Farmers Elevator and Mercantile Co. v. Farm Builders, Inc.,* 432 N.W.2d 864 (N.D. 1988); *F–M Asphalt v. North Dakota State Highway Department,* 430 N.W.2d 344 (N.D.1988); *Beeson v. Wyndmere Public School District No. 42,* 427 N.W.2d 346 (N.D.1988). The terms of a contract are ambiguous when language is subject to more than one construction or when good arguments can be made for either of two contrary positions as to the meaning of a term in a document. *Bye v. Elvick,* 336 N.W.2d 106 (N.D.1983); *See also Barness v. General Diesel & Equip. Co., Inc.,* 422

**570**

N.W.2d 819 (N.D.1988); *Johnson v. Arithson,* 417 N.W.2d 373 (N.D.1988).

In reading ¶¶ 7.3(b) and 12.1 of the subject ground leases the court recognizes no ambiguity. The language of ¶¶ 7.3(b) and 12.1 is clear and unequivocal. Paragraph 7.3(b) requires notice of leasehold mortgagee's address before the landlord is obligated to obtain prior written consent from such leasehold mortgagee. Notice of address or other communication must be in strict compliance with ¶ 12.1 which requires all communications be in writing and mailed return receipt requested. There is no evidence before the court that demonstrates such notice of address of the leasehold mortgagee (NBA) was ever given. Therefore, the court can reach but one conclusion, that because neither Gateway nor NBA provided the address of NBA, the Kavaneys, as landlords, were not obligated under ¶ 7.3(b) to obtain the prior written consent of NBA to terminate the ground lease. Thus, because the Kavaneys complied with the provisions regarding termination, the ground leases between the Kavaneys and Gateway were terminated on June 3, 1989, prior to the Debtor filing for relief under Chapter 11 of the Bankruptcy Code.

 It is well settled that a Debtor may not assume a lease that has been validly terminated prior to the filing for bankruptcy. *In re Memphis–Friday's Associates,* 88 B.R. 830, 834 (Bankr.W.D.Tenn.1988). When lease agreements have been terminated they cease to be assumable under 11 U.S.C. § 365. *In re Mimi's of Atlanta, Inc.,* 5 B.R. 623, 627 (Bankr.N.D.Ga.1980), *aff'd,* 11 B.R. 710 (N.D.Ga.1981). Therefore, because the court has found that the ground leases have been validly terminated the issues of prompt cure and adequate assurances of future performance under § 365, no longer need to be addressed.

Therefore, because the Kavaneys had validly terminated the lease prior to the Debtor, Gateway, filing for relief under Chapter 11 of the Bankruptcy Code, there are no ground leases to assume. Accordingly, the Debtor's Motion to Assume Unexpired Leases is DENIED.

SO ORDERED.